Civil Action No.

ERIKA SMITH

     Plaintiff,

v.

EZEKIEL SPOTTS, individually; and
BOARD OF COUNTY COMMISSIONERS FOR ADAMS COUNTY COLORADO, a municipality;

     Defendants.

---

**AMENDED CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

---

Plaintiff, Erika Smith, by and through her attorneys, Kishinevsky & Raykin, hereby brings this Complaint and Jury Demand against Ezekiel Spotts and the County of Adams Colorado ("Adams") (each a "Defendant" and, together, the "Defendants"), and alleges the following:

## I.     <u>INTRODUCTION</u>

On July 18, 2023, the Plaintiff, Erika Smith ("Plaintiff" or "Ms. Smith"), her mother, Linda Hurley ("Ms. Hurley"), and her then-3-month-old granddaughter, L.S. were attacked by Adams County Sheriff's Office ("ACSO") deputy Ezekiel Spotts ("Mr. Spotts" or "Defendant"). Ms. Smith is an adult woman with disabilities as defined by the Americans with Disabilities Act. 42 U.S.C. § 12102. Ms. Spotts suffers from autism and bi-polar disorder, both of which are conditions that substantially limit one or more major life activities.

On July 18, Ms. Spotts, her mother, and granddaughter, were exiting a Walmart in Thornton, Colorado when they encountered Mr. Spotts. When Mr. Spotts stopped his shopping cart in front of the exit door, Ms. Smith commented that, if he was going to stop, he should move away from

1

the exit door. Apparently angered by Ms. Smith's comment, Mr. Spotts called after Ms. Smith and pursued her as she attempted to exit the Walmart.

Mr. Spotts caught Ms. Smith just after she stepped outside the building. Mr. Spotts continued towards her, squaring his shoulders and pressing his chest forward to intimidate Ms. Smith. Turning to face Mr. Spotts, Ms. Smith moved into a defensive position. When his intimidation attempts failed, Mr. Spotts escalated and shoved Ms. Smith backwards.

As Ms. Smith stumbled backwards, Mr. Spotts continued after her. Anticipating another blow, Ms. Smith struck back at Mr. Spotts to keep him away. Ms. Smith's strike did not deter Mr. Spotts, who continued to pursue Ms. Smith, leading Ms. Smith to strike a second time. Mr. Spotts continued forward, and punched Ms. Smith in the head with a closed fist. Ms. Hurley intervened when Mr. Spotts punched Ms. Smith. As Ms. Smith fell backwards, Ms. Hurley attempted to deescalate the situation with Mr. Spotts. However, Mr. Spotts continued to escalate, yelling, and cursing at Ms. Hurley and Ms. Smith.

Importantly, at that time, Mr. Spotts identified himself as a police officer. While Ms. Hurley was trying to stop Mr. Spotts from continuing after Ms. Smith into the parking lot, he ordered her to stay out of the confrontation and threatened to arrest her for interfering through his authority as a Douglas County Sheriff's Officer. However, Ms. Hurley continued to try to deescalate, and asked for Mr. Spotts badge number, which he refused to provide. Then, Ms. Hurley turned, and followed Ms. Smith into the Walmart parking lot.

At this point, both Ms. Smith and Ms. Hurley were shaken by the confrontation, and Ms. Smith was dazed from the heavy blow to her head. Despite this, they believed the confrontation with Mr. Spotts was finished, and that they could safely return to their car. However, when they reached their car, Ms. Hurley observed Mr. Spotts approaching from the parking lot.

As Mr. Spotts approached, he ordered Ms. Hurley and Ms. Smith to lower their car's trunk door so he could photograph them and their license plate. Mr. Spotts told Ms. Hurley and Ms. Smith he wanted to photograph their license plate so they could be found later. When Ms. Hurley refused to close her trunk door, Mr. Spotts attempted to force it closed. Ms. Smith stepped under the door to hold it open. While Ms. Smith was holding the door open, Mr. Spotts pressed his phone against Ms. Smith's face. Ms. Smith swatted Mr. Spotts phone away, and he escalated with extreme violence.

Mr. Spotts seized Ms. Smith by the neck with both hands. The force of his contact knocked Ms. Smith backwards into the trunk of the car, with Mr. Spotts leaning on top of her body. Mr. Spotts continued to choke Ms. Smith, cutting off her air supply. Ms. Hurley tried to pull Mr. Spotts away from her daughter but was not strong enough to loosen his grip on Ms. Smith's throat. Ms. Smith began losing consciousness and convulsed. Her convulsion jarred Mr. Spotts off balance, causing him to release a hand from her throat. Ms. Hurley seized the opportunity and pulled Mr. Spotts' free hand away from her daughter, drawing Mr. Spotts' attention. Mr. Spotts then released Ms. Smith and turned towards Ms. Hurley.

With one hand, Mr. Spotts seized Ms. Hurley by the arm, while he repeatedly punched her in the face with the other. Ms. Hurley suffered multiple punches to the head, including one which broke her nose. The break in Ms. Hurley's nose caused profuse bleeding, which poured down her face and into her throat. Ms. Hurley's nose bled so badly, that she struggled to breathe through the blood covering her mouth and running into her airway. With Ms. Hurley fully incapacitated, Mr. Spotts tossed her away.

Throughout the confrontation at Ms. Hurley and Ms. Smith's car, Ms. Smith's infant daughter, L.S., remained seated in the seat of a Walmart shopping cart. The cart remained near

the back corner of the car. When Ms. Smith threw Ms. Hurley away, he threw her into the shopping cart. Ms. Hurley collided with the cart, toppling it, and knocking L.S. to the ground, several feet below. L.S. hit the ground and did not move. Ms. Hurley, however, forward, propelled by the momentum from Mr. Spotts' throw. She fell passed the shopping cart and collided with a neighboring car, spraying it with her blood.

Thankfully, at this point, courageous bystanders intervened and called 9-1-1. The bystanders notified Mr. Spotts that they were calling the police, and he stopped his attack. Several of the bystanders helped Ms. Hurley and Ms. Smith to their feet and applied napkins to Ms. Hurley's nose to staunch the bleeding. Ms. Smith identified L.S. on the ground, unresponsive, and told the bystanders that she needed to take her daughter and mother to the hospital. Ms. Smith told the bystanders the address of the hospital where police could find her and drove her family away.

Meanwhile, believing he had done nothing wrong, Mr. Spotts remained at the Walmart as Thornton Police Department ("TPD") officers arrived. Mr. Spotts then identified himself as law enforcement again. He explained that he initiated the physical confrontation with Ms. Smith at the Walmart exit and pursued Ms. Smith and her family into the parking lot to collect their photos and license plate number.

Incongruously, the Adams County District Attorneys' Office declined to charge Mr. Spotts with any criminal conduct. The Adams County DA's decision was taken despite clear evidence as follows:

1. Walmart surveillance footage which captured the initial altercation at the Walmart exit. The footage shows Mr. Spotts a) verbally initiate the confrontation with Ms. Smith, and b) initiate physical violence when Ms. Smith remained unintimidated.

2. Witness statements corroborating Ms. Smith and Ms. Hurley's accounts of the second incident. Witnesses particularly observed Mr. Spotts punching Ms. Hurley, as well as

observing Ms. Hurley and Ms. Smith being tossed around, and seeing Mr. Spotts on top of Ms. Smith in the back of the family's vehicle.

3. Mr. Spotts' own statements admitting that he initiated both confrontations.

4. The incredible discrepancy in injury severity between Ms. Smith and Ms. Hurley, and Mr. Spotts.

Because of Mr. Spotts actions, Ms. Smith suffered severe physical injuries and pervasive emotional and mental distress.

## I.   **JURISDICTION AND VENUE**

1. This action arises under the Constitution and laws of the United States, including, 42 U.S.C. § 1983, 1988, and the laws of the State of Colorado, including Colo. Const. art. VI, § 9(1), and Colo. Rev. Stat. § 13-1-124.

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343 relative to the federal claims. Jurisdiction for the supplemental state law claims is conferred upon this Court by 27 U.S.C. § 1367.

3. Venue is proper within the District of Colorado pursuant to 28 U.S.C. § 1391(b) because all the events giving rise to the claims in this matter occurred within the District of Colorado.

4. Plaintiff timely and properly submitted a Notice of Claims in connection with the state law claims stated in this matter and has properly exhausted all administrative remedies

## II.   **PARTIES**

5.    At all times relevant to this action, Erika Smith was an adult resident of the State of Colorado and citizen of the United States. At all times relevant to this action, Erika Smith was a person with disabilities as that term is defined in both Section 504 and the ADA.

6.    At all times relevant to this action, Defendant Ezekiel Spotts was a citizen of the United States and a resident of the state of Colorado and was acting under color of state law in his capacity as a law enforcement officer with the Adams County Sheriff's Office.

7.    Adams County is a municipality in the State of Colorado and is a "person" subject to suit under 42. U.S.C. § 1983.

8.    The Adams County Sheriff's Office is a department of Adams County. At all times relevant to this matter, officers, and personnel of the Adams County Sheriff's Department ("ACSO") were acting as agents of Adams County under color of state law.

9.    At all times, Defendant Adams County was responsible for the oversight, supervision, discipline, and training of ACSO personnel, including Defendant Spotts.

## II.    FACTUAL ALLEGATIONS

10.    The Plaintiff, Ms. Smith, is a disabled woman who suffers from Autism Spectrum Disorder ("autism") and Bipolar Disorder ("bipolar").

12.     Autism is a brain development disorder that inhibits social communication and interaction. Autism is a spectrum disorder, referring to the disorder's "wide range of symptoms and severity."[1]

13.     Autism manifests through impaired communication, social interaction, and limited or repetitive behaviors.

Bipolar disorder is a mental health condition causing extreme mood swings from emotional highs (mania) to lows (depression).[2]

15.     Mental and intellectual disabilities manifest in behaviors that are commonly misunderstand and associated with "perceived criminal activities and threats."[3] Accordingly, officers are encouraged to moderate their reactions and give individuals time and space to gauge whether there is a real threat, or if perceived behaviors are related to disability.

16.     Defendant Spotts entirely failed to apprehend and respond to Ms. Smith's disability manifestations. Instead, at each juncture, he treated Ms. Smith's disability manifestations as challenges to his authority and escalated the confrontation.

17.     Despite Ms. Hurley's efforts to deescalate and retreat from the confrontation, Defendant Spotts continually instigated and exacerbated the confrontation before violently

---

[1] Autism Spectrum Disorder (https://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/symptoms-causes/syc-20352928).
[2] Bipolar Disorder (https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955).
[3] Advancing Public Safety for Officers and Individuals with Intellectual and Developmental Disabilities (I/DD) (https://cops.usdoj.gov/html/dispatch/05-2019/intel_disability.html).

attacking the Plaintiff and her family, where she sustained significant and lasting physical and emotional injuries.

18. On or about July 18, 2023, the Plaintiff, her mother and granddaughter, were attacked by Defendant Spotts while exiting a Walmart in Thornton, Colorado.

19. As the Plaintiff and her family approached the exit, Defendant Spotts and Mandy Hill ("Ms. Hill") stopped their shopping cart in front of the exit door. Ms. Hurley turned and passed the Defendant while the Plaintiff followed behind with the family's shopping cart. Watching her baby, at first, the Plaintiff did not see the Defendant had stopped in front of the exit. Looking up, the Plaintiff saw the Defendant and Ms. Hill and narrowly avoided rear-ending the Defendant's shopping cart:

 

*First, Ms. Hurley passes behind Defendant Spotts and Ms. Hill. In the second photo, the Plaintiff passes follows her mother, passed Defendant Spotts and Ms. Hill.*

23. As the Plaintiff passed the Defendant, she chided Defendant Spotts and Ms. Hill for stopping their cart suddenly in front of an exit.

24.     Defendant Spotts responded to the Plaintiff comment with significant anger. Following her, he called after the Plaintiff for "running her mouth", and dared her to "say it to his face":



25.     Hearing Defendant Spotts, the Plaintiff turned back and faced him. Defendant Spotts rushed to confront the Plaintiff face-to-face. Squaring his shoulders, he stalked towards, attempting to intimidate the Plaintiff by pressing his face within inches of her own:



26.	Defendant Spotts approached the Plaintiff despite the availability of an alternative

exit within feet of his location:



**<u>Defendant Spotts Immediately Escalated the Situation by Verbally Threatening and Physically Assaulting the Plaintiff's Daughter</u>**

27.	At this point, Defendant Spotts seriously escalated the confrontation. After failing

to intimidate the Plaintiff, Defendant Spotts escalated to physical violence. Using his left hand,

Defendant Spotts shoved Ms. Smith in the chest, knocking her backwards:



28.     As Ms. Smith stumbled backwards, Defendant Spotts pushing forward. When she regained her balance, Ms. Smith twice struck out at Defendant Spotts. Defendant Spotts continued pursuing Ms. Smith and prepared to punch her:

  

29.     Defendant Spotts planted his right foot and drew back his right hand with a closed fist. Defendant Spotts punched the Plaintiff in the head, throwing her backwards:

 

11

30.     Defendant Spotts punch knocked the Plaintiff away from the exit and Ms. Hurley rushed to intervene as Defendant Spotts continued to pursue the Plaintiff.



31.     Throughout this time, Ms. Hill remained standing in the Walmart, and never intervened.

**Defendant Spotts Identified Himself as Law Enforcement**

32.     At this point, Ms. Hurley successfully separated Defendant Spotts from the Plaintiff by placing herself in his path. However, Defendant Spotts then shifted his aggression to Ms. Hurley.

33.     Defendant Spotts clearly informed Ms. Hurley that he was a law enforcement officer. He threatened to arrest her for "interfering." Ms. Hurley requested his badge number, which he refused to provide. Ms. Hurley then followed her daughter into the parking lot.

**Defendant Spotts Pursued the Plaintiff After She Withdrew from the Confrontation**

34. Defendant Spotts further escalated by following the Plaintiff and her family to their car.

35. Defendant Spotts approached the Plaintiff and instructed them to close their trunk door so he could photograph the Plaintiff's family and license plate number.

**Defendant Spotts Re-Engaged Plaintiff and Escalated the Situation by Physically Assaulting the Plaintiff, her daughter, and mother.**

36. Defendant Spotts rushed forward and grabbed Ms. Hurley's trunk door, attempting to force it closed. The Plaintiff stepped underneath the door to keep it open.

37. Defendant Spotts thrust his cell phone at the Plaintiff, contacting her face. In response, the Plaintiff swatted the Defendant's phone away from her face.

38. Defendant Spotts responded by punching the Plaintiff and seizing her throat. The Plaintiff fell backwards under the Defendant's sudden onslaught. Defendant Spotts continued to choke her as he leaned over her body.

39. The Plaintiff could not wrest Defendant Spotts' hands from her throat. She began to lose consciousness, and her body convulsed.

40. The Plaintiff's convulsion knocked Defendant Spotts off balance, causing him to remove one hand from the Plaintiff's throat.

41. Ms. Hurley seized the opportunity and drew Defendant Spotts away from her daughter.

42. Defendant Spotts pivoted to Ms. Hurley, seized her by the arm, and punched her repeatedly in the head.

43. Defendant Spotts punched Ms. Hurley approximately five times in the head, breaking her nose.

44.     The Plaintiff regained sufficient consciousness and pushed Defendant Spotts away from her mother. Defendant Spotts then threw Ms. Hurley into the car in the next parking space.

45.     When Defendant Spotts tossed Ms. Hurley's body, he threw her into her by-standing shopping cart, where her infant granddaughter remained seated. When Ms. Hurley's body struck the cart, it toppled over, sending the L.S. falling onto the pavement below.

46.     L.S. struck the ground and remained unresponsive.

47.     Ms. Hurley continued her fall, and struck an adjacent vehicle, spraying it with blood.

48.     Several witnesses intervened and informed Defendant Spotts they were calling the police. Defendant Spotts then stood nearby and awaited the arrival of law enforcement.

49.     The Plaintiff discovered her infant child unresponsive on the pavement.

50.     The Plaintiff gathered her daughter and her dazed and injured mother into the car and drove the family to a nearby emergency room.

51.     The Plaintiff told witnesses she was going to the hospital and requested that they inform the police of their location when officers arrived.

52.     Witness statements captured in Thornton Police Department ("TPD") incident reports indicate that Defendant was seen punching both Plaintiff and her daughter in the head.

53.     Another witness observed Defendant Spotts holding Plaintiff's daughter down in their car, with his hands near her shoulders.

54. TPD incident reports also note officers' personal observations of Walmart security footage, referenced in the above images, showing Defendant Spotts initiate the first altercation by shoving and punching Plaintiff's daughter.

55. Officers also observed Plaintiff intervene and separate Defendant Spotts from her daughter.

56. Defendant Spotts and Ms. Hill also submitted written statements to TPD. Both acknowledged that Defendant Spotts initiated physical contact at the Walmart exit.

57. Both Defendant Spotts and Ms. Hill also acknowledged Defendant Spotts approached Plaintiff at her car, where he engaged in another physical confrontation.

58. Contrary to witness reports and other evidence, neither Defendant Spotts nor Ms. Hill acknowledge that Defendant Spotts threw any more than a single punch, at the Walmart exit. Likewise, Defendant Spotts and Ms. Hill do not acknowledge any conduct that caused severe injuries to the Plaintiff and Ms. Hurley when Mr. Spotts confronted them at their car.

59. Defendant Spotts attempted to justify his violent behavior by asserting his authority as law enforcement even though he 1) initiated the physical contact and 2) utilized overwhelming violence jeopardizing the lives of Plaintiff, her daughter, and granddaughter.

60. The inadequate training and supervision, as detailed in this Complaint, that Defendant Spotts received from Adams County influenced him to respond to this incident with excessive force.

**Ms. Smith Suffered Significant Injuries as a Result of the Defendants' Actions and Adams County Sheriff's Office's Inadequate Training, Supervision, and Culture of Police Violence**

61.     Some of the Plaintiff's injuries were immediately visible following the attack by Defendant Spotts.

62.     Witness and incident reports from TPD reveal that the Plaintiff suffered bruising red marks from Defendant Spotts' punches to her head, as well as red marks on her throat from his attempts to choke her.

63.     The Plaintiff also suffered physical injuries to her foot.

64.     The Plaintiff also suffered severe mental and emotional distress from Defendant Spotts' attack.

65.     She suffers daily from the traumatic stress of the event and it continues to affect her mental and emotional wellbeing.

**Adams County Hired and Retained Defendant Spotts Despite his History and Warnings Regarding the Fact that he was Unfit for Duty**

66.     Prior to the incident involving the Plaintiff, Defendant Spotts was involved in a remarkably similar incident in 2017.

67.     During this incident, which occurred on April 27, 2017, Defendant Spotts significantly injured an inmate at the Adams County Jail.

68. During the April 27, 2017, incident, Defendant Spotts used excessive physical force against an individual after exchanging words, leading to significant head trauma for the individual.

69. Defendant Spotts violated two department policies including one for the use of force and one for failing to complete a report detailing his use of force.

70. Defendant Spotts is also employed as a guard at the Adams County Jail. The Adams County Jail is well known for a history of guards using excessive force against inmates.[4] Defendant Spotts trained and worked in this environment.

### The Actions and Inactions of the County of Adams Were Causal Factors in the Underlying Cosntitutional Violation

71. Defendant Spotts' treatment of the Plaintiff was conducted in pursuit of Adams' training, custom, policy, and practice of unlawful conduct. Adams' longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the excessive use of force caused Defendant Spotts to use unlawful and excessive force against the Plaintiff.

72. Adams police officers' unlawful conduct, including that of Defendant Spotts, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

---

[4] The Denver Post, *Records Show Several Excessive-Force Cases in Metro Denver Jails*, Jan. 22, 2021, available at https://www.denverpost.com/2014/12/02/records-show-several-excessive-force-cases-in-metro-denver-jails/

73.     Adams' unlawful customs, policies, and practices are demonstrated by its history of misconduct and brutality, as reflected in both a statistical analysis of its policing and by the many prior incidents involving Adams County officers engaging in such conduct. Accordingly, Adams knew or should have known of the obvious risk of harm faced by members of the public and individuals with disabilities when contacted by ACSO, yet the County took no or inadequate action to address such risk in the years leading up to Defendant Spotts' attack on the Plaintiff.

73.     Given ACSO's long history and widespread practice of ACSO officers using excessive force against people, Adams knew or had constructive knowledge that its officers used excessive and unnecessary force and/or would be unable to competently navigate interactions with individuals with disabilities when contacting members of the community, and that such bias could cause the ACSO officers to utilize excessive and unnecessary force against disabled people like the Plaintiff.

74.     In light of this knowledge, Adams County and its Sheriff could have and should have pursued reasonable methods for training and supervising ACSO officers, including Defendant Spotts, in interacting with members of the public and individuals with disabilities, and the appropriate use of force, but it failed to do so.

75.     Regarding training and supervision, Adams County trained and encouraged officers to default to the use of the maximally permitted level of force rather than non-force

alternatives and to use force whenever force could be legally justified, rather than limiting the use of force for when force is necessary.

76.     Regarding hiring, investigation, and discipline, Adams gives virtually unbridled authority to the Sheriff's Office. Moreover, ACSO operates in such a way that officers who violate the law or policy regularly remain on the force.

77.     Adams County, through the Sheriff's Office, persistently failed to meaningfully investigate and discipline numerous ACSO officers for their similar use of excessive force.

78.     The Sheriff's Office's failure to find officer wrongdoing and failure to discipline officers in this case and in the cases described below and others reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by Adams, that such conduct is customary within ACSO, and were the moving force behind Defendants violating the Plaintiff's rights.

79.     Adams' unlawful customs, policies, and/or practices are demonstrated in numerous ways, including through high profile cases showing that ACSO officers, particularly those working in the Adams County Jail, are more likely to use force without justification and to excessive levels.

80. For example, on October 9, 2009, ACSO officers seized Gary Gurule after he requested to use the bathroom. ACSO officers punched Mr. Gurule in the head, lifted him into the air, and slammed him into the floor. Mr. Gurule suffered permanent damage to his shoulder, elbow, and jaw. Officers' use of force was evidently a reaction to Mr. Gurule's statements.

81. On September 25, 2009, 64-year-old Robert Crespin was similarly seized and beaten in the Adams County Jail. Officers treated Mr. Crespin so roughly while handcuffing him that they fractured his right arm in two places, and seriously injured both rotator cuffs and shoulders.

82. The officers that injured Mr. Gurule and Mr. Crespin were not disciplined by Adams County nor the Sheriff's Office. Both incidents were evidently precipitated by words Mr. Gurule and Mr. Crespin spoke to ACSO officers. Neither Mr. Gurule nor Mr. Crespin made threats of physical violence, nor were they able to, detained within the Adams County Jail. The ACSO officers however reacted to their statements with extraordinary violence.

83. On January 22, 2011, Mario Ybarra was similarly assaulted while being booked into the Adams County Jail. As captured on video, Mr. Ybarra was standing at a printer and disparaging a deputy's lack of knowledge about operating the printer when suddenly a deputy tackled Mr. Ybarra and threw him to the ground. Several more officers then joined in. The offending officers then all lied in their reports explaining that Mr. Ybarra attempted to walk away before being chased down. The officers lied despite clear video evidence showing Mr.

Ybarra standing still before he was suddenly attacked. Again, the officers reacted to Mr. Ybarra's words with extreme violence.

84.     On May 17, 2015, Alexander Garcia, a wheelchair bound individual, was assaulted by ACSO officers at the Adams County Jail. According to video evidence, as in similar statements, Mr. Garcia makes verbal comments to ACSO officers who respond with extreme violence. The officers seize Mr. Garcia, pull him from his wheelchair, and throw him to the ground. Initially, Adams County charged Mr. Garcia with assaulting the ACSO officers, before dismissing the charges. However, the affidavit entirely excluded the fact that Mr. Garcia was wheelchair bound throughout the entire encounter. As in other cases, ACSO officers reacted to Mr. Garcia's statements with extreme violence and avoided sanction for their actions.

85.     On August 23, 2018, Jeffrey Helvie, was assaulted by ACSO officers. The incident occurred when an ACSO officer pulled Mr. Helvie over. Mr. Helvie declined to answer the officer's questions, who ordered him out of his car. The officer then opened the car and threw Mr. Helvie to the ground and dragged him away from the car, where he dropped his knee to Mr. Helvie's back and chest. Mr. Helvie suffered broken ribs from the officer's use of force.

86.     In September 2018, John Jordan was assaulted by ACSO officers. Mr. Jordan responded to news that his nephew had been involved in a car accident while driving Mr. Jordan's company truck. At the scene of the accident, Mr. Jordan criticized the ACSO officers involved. Responding to Mr. Jordan's statements, ACSO officers seized Mr. Jordan by the arm,

and took him to the ground. Importantly, the officer's decision to seize and charge Mr. Jordan was based on their perception that he was interfering with their authority. Like other cases described herein, ACSO officers reacted to the perceived challenge to their authority with violence cloaked under their authority as law enforcement.

87. On December 3, 2019, Anthony Perez was assaulted by ACSO officers. The incident, captured on a cell phone video, shows Mr. Perez telling officers "I can't breathe" before the offices punch him in the head. Before the video came to light, ACSO officers claimed that Mr. Perez was resisting arrest and, in a use of force report, none mentioned that Mr. Perez was punched in the head. Again, in Mr. Perez's case, ACSO officers reacted to comments from Mr. Perez that they apparently perceived as challenging their authority with extraordinary violence.

88. On December 13, 2023, Gabriel Sisneros was assaulted and subjected to an illegal chokehold by ACSO officers. The incident, captured on video, reveals Mr. Sisneros standing and talking with ACSO officers who suddenly seize him and place him in the chokehold. As with the other incidents, this unlawful use of force was apparently precipitated by the ACSO officers becoming enraged by Mr. Sisneros and reacting with extraordinary force and violence.

89. This consistent pattern of unconstitutional police behavior, all or nearly all of which, was claimed by Adams itself to be within its authorized and approved policies, training, and customary practices, raises a more than plausible and compelling inference of purposeful policies, or tacit endorsement, of extreme violence by ACSO officers. Further, they reflect a

marked failure to develop sufficient training or practices regarding de-escalation or alternatives to the use of extreme force. Evidence of these other wrongs, as set forth herein, is legally admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**<u>Adams County Sheriff's Office Law Enforcement Academy and In-Service Trainings were the Moving Force and Causal Factors Behind Defendant Spotts Violating Ms. Smith's Constitutional Rights</u>**

90. ACSO operates its own police academy. Through training used for many years ACSO teaches officers to use aggressive tactics.

91. ACSO trains officers on what is permissible rather than what is proper, which is a chief contributor to its officers' violations of the law, including the violations to the Plaintiff.

92. ACSO officers are not sufficiently trained to utilize arrest control techniques and attempt to use tactics beyond their fitness and skill level, which results in a widespread pattern and practice of unjustified, excessive force. This insufficient training was a causal factor in Plaintiff's assault.

93. ACSO officers have historically demonstrated they are not trained to properly use arrest control techniques, particularly martial arts techniques, to effectuate arrests, as numerous officers have demonstrated that they do not know how to respond in critical incidents.

94. ACSO in-service training is *ad hoc* and does address specific needs of the organization as shown by officer behavior.

95.     Defendant Spotts was inadequately trained, which contributed to his improper and excessive force. By way of only a few examples of Defendant Spotts' inadequate training: (1) Defendant Spotts used force when no crime had been committed by Plaintiff and she otherwise posed no threat to himself or others; (2) Defendant Spotts continued to use force on Plaintiff even after she was subdued; (3) Defendant Spotts continued to escalate his level of violence despite the lack of any real threat; (4) Defendant Spotts re-initiated a violent confrontation without sufficient reason; (5) Defendant Spotts acted as expected of an untrained officer in an emotional state.

96.     The responsibility for inadequate and outdated policies and training in effect at the time of Plaintiff's assault fall directly upon the County of Adams.

97.     With insufficient training, officers are unequipped to effectuate arrests or regulate their behavior without resorting to dangerous tactics like those used by Defendant Spotts.

### III.     <u>CLAIMS FOR RELIEF</u>

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Excessive Force**
**Violation of the 4th Amendment**
(Plaintiff Against Defendant Spotts)

98.     Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if set forth fully herein.

42 U.S.C. § 1983 provides:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

44. Defendant Spotts is a person for purposes of 42 U.S.C. § 1983.

45. Defendant Spotts, at all times relevant to this action, was acting under color of state law in his capacity as an Adams County Sheriff's Office deputy, and his acts and/or omissions were conducted within the scope of his official duties and employment.

46. At the time of the complained of events, the Plaintiff had a clearly established constitutional right under the Fourth Amendment to be secure in her person from unreasonable seizure through excessive force by law enforcement.

47. Any reasonable police officer knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

48. Defendant Spotts engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting him, thereby violating Plaintiff's Fourth Amendment right to be free from excessive force.

49. As described in detail above, it was not objectively reasonable for Defendant Spotts to physically assault, subdue, and threaten to arrest Plaintiff in the absence of any conduct or information indicating she committed a crime, notwithstanding whether he was frustrated with her seeming interferences with his investigation.

50.    The acts or omissions of Defendant Spotts were the legal and proximate cause of Plaintiff's damages.

51.    As a proximate cause and result of Defendant Spotts unlawful conduct, Plaintiff has suffered actual physical bodily and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, excruciating pain, and severe emotional distress.

52.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgement interest and costs as allowable by federal law.

53.    As a direct and proximate result of the acts, omissions, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

54.    In addition, Plaintiff is entitled to punitive damages against Defendant Spotts, in that his actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Unlawful Seizure**
**Violations of the 4th Amendment**
(Plaintiff Against Defendant Spotts)

26

55.     Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if set forth fully herein.

56.     Defendant Spotts was acting under color of state law with respect to his actions and inactions at all times relevant to this action.

57.     At no relevant time did Defendant Spotts have probable cause or reasonable suspicion, or any other legally valid basis, to believe that the Plaintiff had committed or was committing any violation of the law prior to seizing and continuing to illegally restrain her person or property.

58.     At no relevant time did Defendant Spotts have probable cause or reasonable suspicion, or any other legally valid basis, to believe that the Plaintiff had committed or was committing any violation of the law prior to illegally seizing and restraining her person or property.

59.     At no relevant time did Defendant Spotts have a reasonable basis for believing that Plaintiff was an imminent danger to herself or others. No exigent circumstances existed justifying the Defendant's unlawful seizure of the Plaintiff or her property.

60.     At no relevant time did Defendant Spotts have a warrant authorizing seizure of the Plaintiff's person or property.

61. During the seizure, as described in more detail above, the Defendant intentionally, forcefully, and violently restrained the Plaintiff's person against her will, despite lacking any legally valid basis for his actions.

62. Defendant Spotts' actions were objectively unreasonable in light of the circumstances confronting him, and violated clearly established law, which a reasonable official in his position would have known.

63. Defendant Spotts engaged in these unlawful actions intentionally, willfully, and wantonly.

64. As a direct and proximate result of the acts, omission, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Hire, Investigate, Train, Supervise, and Discipline**
*Monell* **Claim**
(Plaintiff Against Defendant Adams)

65. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if fully set forth herein.

66. Adams County failed to properly train, supervise, and discipline its employees, including Defendant Spotts, with respect to the use of force and his responsibilities related to off-duty interventions and interactions with members of the public and individuals with disabilities.

28

67. Adams County further failed to properly train, supervise, and discipline its employees, by inculcating a responsibility on the part of the officers—through formal policy, training, and actual practices and habits within the department—to actively seek out potentially dangerous and violent interactions while off-duty, the consequences of which result in increased incidents of unwarranted and unnecessary force against members of the public and individuals with disabilities.

68. Adams, through the Sheriff's Office, failed to hire officers, specifically Defendant Spotts, in a manner that would not lead to the deprivation of the Plaintiff's constitutional rights.

69. Adams gave hiring autonomy to the Adams County Sheriff's Office, who, in turn, hired and retained Defendant Spotts despite his record of using excessive and unlawful force, and failing to report the use of force, making it plainly obvious that he was an unfit candidate and had a propensity for violence.

70. Adams, through the Adams County Sheriff's Office, also failed to discipline officers in a manner that would not lead to the unlawful use of force. The Sheriff's Office fails and refuses to discipline officers for the unlawful use of excessive force, sending a signal that Adams not only tolerates, but actually endorses and awards officers who use excessive force.

71. Adams' failure to, in its supervisory duties, adequately investigate and hire, train, supervise, and discipline its officers with respect to the use of excessive force is a custom,

policy, and/or practice of Adams and a moving force behind the constitutional violation described herein.

72. The constitutional violations—federal and state—perpetrated against the Plaintiff in this manner were a foreseeable consequence of Adams' actions and inactions.

73. Aurora was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, aggressive off-duty policing, and interacting with members of the public and individuals with disabilities. Adams could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

74. Adams' policies, customs, and/or practices in failing to properly monitor, train, supervise, and discipline its employees were the causal force and proximate cause of the violation of the Plaintiff's federal and state constitutional rights.

75. The acts or omissions of Adams caused Plaintiff damages in that she suffered extreme physical injuries and pain and extensive emotional and mental suffering during and after the assault.

76. The actions or omissions of Adams as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities, secured by the Constitution of the United States of America, and caused her other damages.

## FOURTH CLAIM FOR RELIEF
### Colo. Rev. Stat. § 13-21-131
### Colo. Const. Art. II, Section 7 – *Excessive Force*
(Against Defendant Spotts)

77. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if set forth herein.

78. At all relevant times, Defendant Spotts was a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

79. At all relevant times, Defendant Spotts was acting under color of state law in his capacity as an Adams County Sheriff's Office law enforcement officer.

80. Plaintiff has a protected interest under Colorado Constitution Article II, Section 7, in being free from the use of excessive force by law enforcement personnel.

81. Defendant Spotts violated Plaintiff's state constitutional rights by using objectively unreasonable force against Plaintiff.

82. Defendant Spotts seized Plaintiff by means of unreasonable physical force including but not limited to, punching the Plaintiff in the face and head numerous times with a closed fist, and throwing Plaintiff to the ground.

83. Defendant Spotts had no reasonable basis to believe Plaintiff posed a threat of harm to him or any other person.

84. Defendant Spotts did not have a legally valid basis to seize Plaintiff in this manner and with the level of force used under the circumstances presented.

85. Defendant Spotts use of force against Plaintiff, as described here, was objectively unreasonable in light of the circumstances confronting him before and during the encounter with Plaintiff.

86. Defendant Spotts subjected or caused Plaintiff to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

87. Defendant Spotts did not act upon a good faith and reasonable belief that his actions in using unreasonable and excessive force against Plaintiff was lawful.

88. The actions and inactions of Defendant Spotts' employer, Adams County, through the Adams County Sheriff's Office, were moving forces behind and causal factors of the underlying constitutional violations to the Plaintiff.

89. Given that the actions and inactions of Adams, as described throughout this Complaint, were causal factors of the underlying constitutional violations, pursuant to C.R.S. § 13-21-131(4)(a), Adams must indemnify Defendant Spotts.

90. Also pursuant to C.R.S. § 13-21-131(4)(a), even if Aurora determines that Defendant Spotts did not act upon a good faith and reasonable belief that his actions were lawful, then Defendant Spotts merely "shall not be indemnified [by Adams County] for five percent of the judgement or settlement or twenty-five thousand dollars, whichever is less."

32

91.     In other words, even if Adams County's actions and inactions are not found to be causal factors in the underlying violations, Adams can only escape indemnification in the amount of five precent of the judgement or settlement or twenty-five thousand dollars, whichever is less. Even so, under this scenario, "if [Defendant Spotts'] portion of the judgement is uncollectible, [Adams County] shall satisfy the full amount of the judgement or settlement." C.R.S. § 13-21-131(4)(a). [5]

92.     By failing to sufficiently train and discipline ACSO officers regarding de-escalation and the proper use of force, appropriate conduct for off-duty officers, and interacting with members of the public and individuals with disabilities, among other things, Adams County caused the Plaintiff to subjected to a deprivation of her civil rights.

93.     Adams County's well-documented history of using excessive force without fear of discipline, failure to train its officers in proper arrest control techniques, failure to require ongoing training for officers, and condoning years of police brutality were the cause and moving force of the Plaintiff's civil rights deprivations.

94.     Adams County failed to create and oversee appropriate expectations for responsible behavior, and these failures were the moving force behind Defendant Spotts' unlawful use of force against the Plaintiff.

---

[5] "[A] plaintiff may be the beneficiary of indemnification by the municipality if the peace officer does not have the funds to pay the judgment." Ditirro v. Sando, 520 P.3d 1203, 1209 (Colo. App. 2022).

95. Adams County, through the Adams County Sheriff's Office, also failed to investigate and hire officers in a manner that would not lead to unlawful use of force by ACSO officers.

96. Adams County is liable for the acts and omissions of its agents and/or employees, and for the herein described acts by Defendant Spotts, who was acting within the scope and course of his employment.

97. Defendant Spotts' conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which Defendant Spotts must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly Plaintiff.

WHEREFORE, Plaintiff respectfuly requests that this Court enter judgement in her favor, and against the Defendants, and award all relief as allowed by law and equity as appropriate, including, without limitation, the following:

    a. Declaratory and injunctive relief;

    b. Actual economic damages as established at trial;

    c. Compensatory damages, including, without limitation, those for past and future pecuniary and non-pecuniary losses, pain and suffering, emotional distress,

impairment of quality of life, reasonable and necessary medical and other expenses;

d. Pre- and post-judgement interest at the highest lawful rate;

e. Attorneys' fees and costs of associated with this action; and

f. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated this October 24, 2024

*/s/ Igor Raykin*
Igor Raykin
Conor O'Donnell
2851 S. Parker Rd.
Ste 150
Aurora, Colorado 80014
(720) 863-4256 (p)
igor@coloradolawteam.com
conor@coloradolawteam.com
